IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DESHAWN CIRINO | No.  1:23-cr-10186-ADB-6 |

## **DEFENDANT DESHAWN CIRINO'S SENTENCING MEMORANDUM**

Defendant, Deshawn Cirino, comes before the Court to face the consequences of his guilty plea to one count of RICO conspiracy, 18 U.S.C. § 1962(d), based on two predicate acts of marijuana distribution in connection with the Heath Street gang. Mr. Cirino has no prior criminal history, graduated from the RISE program in April, 2026, and has been successful on pre-trial release for 30 months in this case. He respectfully requests that the Court join him and his family in supporting his progress—including therapy, job training, sobriety, and volunteering as a home healthcare assistant—and sentence him to **time-served,** with two years of supervised release. No further punishment is needed, and any further prison sentence would wipe out all the progress he has made in RISE.

The defense anticipates the government will argue Deshawn should be held criminally responsible for a shooting committed by three individuals on May 11, 2022, using his scooter. The argument is unsupported and the sentencing consequence would be fundamentally unfair. By the government's own admission, there is no evidence Deshawn *knew* what the individuals were going to do with the scooter. He is not responsible for the shooting.

### ARGUMENT

Deshawn is 28 years old.  He is a first-time, non-violent offender who pleaded guilty to selling marijuana for the Heath Street gang, his childhood friends from growing up in the Heath

Street housing development. *See* R11 Tr. at 18 (pleading guilty to "distribut[ing] marijuana in the [Heath Street] development in the period of approximately July 2021 to September 2021"). He successfully completed the RISE program, has been in therapy, and serves as an integral part of his family's round-the-clock care system for his older, severely disabled brother, Nathan, and the care of his younger brother, Jacob. Deshawn also has been volunteering as a home care assistant to a disabled elderly woman, working to create pro-social networks in his life, and volunteering with youth. Given his lack of criminal history, his hard-fought gains during RISE, and his role as a caretaker to his older brother, the requested sentence puts Deshawn on the best path to continue his positive trajectory, for himself, his family, and the community.

I.    **DESHAWN'S HISTORY AND ROLE IN THE OFFENSE SUPPORT THE REQUESTED SENTENCE.**

A.  **Deshawn's History**

As described in the PSR, Deshawn's upbringing was not easy and his life remains challenging now. His older brother, Nathan, is severely disabled and their mother has cared for Nathan, at home, throughout Deshawn's life. Nathan suffers from cerebral dysgenesis (a brain malformation), cerebral palsy, autism, a seizure disorder, hemigenesis (weakness or inability to move one side of the body), hearing loss on one side, and an intellectual disability. He requires round-the-clock care and has been experiencing an uptick in seizures over the past year. During middle-of-the-night emergency trips, Deshawn's mother needs Deshawn to either accompany the older brother to the hospital or stay home with the younger brother, Jacob, who is 12. Deshawn grew up watching his mother struggle to care for Nathan, with Nathan consuming most of the family's resources. His mother frequently turned to alcohol, which led to volatile disagreements between Deshawn's mother and father. *See* PSR ¶ 99.

Deshawn's biological father left the family when Deshawn was 14 years old. This led to increased financial strain, decreased parenting resources, and Deshawn spending more and more

time outside the home. *See* ¶¶ 99-100. Between the ages of 13 and 16, he dropped out of school and had several run-ins with the law, all of which were relatively minor and none of which resulted in criminal convictions. By age 18, Deshawn realized that he needed to "step up" and help support the family, "as he grew concerned over the lack of food due to the financial constraints [the family] suffered." ¶ 100. From 2013, when Deshawn was 15 years old, until 2023, when he was arrested for the marijuana-related activity underlying this case, Deshawn had no contact with the criminal justice system.[1] Given the level of hardship, trauma, and hopelessness all around him growing up, this is remarkable.

Deshawn lives with his mother and three brothers in Dorchester. He also enjoys the fierce love and support of his maternal grandmother, Ms. Brunilda Rivera ("Brunie"). Brunie has attended every court hearing in this case and she spoke at Deshawn's RISE graduation, concluding with a proud and tearful, "I love you with my whole heart, Deshawn!"

Deshawn has lived a very difficult life. He has experienced a level of death that is more reminiscent of a war zone than an American city. When Deshawn was in middle school, his close friend, Xavier, who was handicapped, died of his illness. Xavier and his family were like a "second family" for Desahwn. The boys spent a lot of time at each other's houses, watching TV and playing video games. Deshawn used to help Xavier dress and bathe. Deshawn remembers all the crying at the funeral. After Xavier passed away, Xavier's mother passed away, too.

When Deshawn was a teenager, his best friend, Mason, was stabbed to death. Then, as a young adult, his close friend Moises was shot to death. Last year, Deshawn's 18-year old cousin, Isabella, committed suicide. He lost both of his grandfathers in a span of six months. Earlier this year, his 27-year-old friend, Emma, died in her sleep. They had been friends since middle school, when Deshawn used to defend Emma from bullies.

---

[1] His record shows an entry for "vandalism," which was "dismissed" without an arraignment.

This level of death has left Mr. Cirino in a kind of silence; it has warped his experience of the present and made it hard to imagine a future. Author Jesmyn Ward grew up amidst a similar epidemic of young deaths in Mississippi, and wrote a memoir about losing five of her peers, who were killed young:

> [I]t's a brutal list [of lives lost], in its immediacy and its relentlessness, and it's a list that silences people. It silenced me for a long time. . . . Sometimes . . . I wonder at my neighborhood's silence. I wonder why silence is the sound of our subsumed rage, our accumulated grief. . . . My hope is that [by writing this] . . . I'll understand a bit better why this epidemic happened, about how the history of racism and economic inequality and lapsed public and personal responsibility festered and turned sour and spread here.

*Men We Reaped* at 7-8 (Bloomsbury 2013). Ms. Ward described how, "[e]very day, I woke up with that feeling of dread and that just overwhelming sensation of loss, and then of course that fear — who's going to die next? We talked about it, you know, we talked about it. . . . it felt like we were under siege, and so we just weren't smart about all the drinking and all the drugs and everything that we did." "New Memoir Recounts Black Lives 'Reaped' Too Young," *NPR* (Sept. 15, 2013).[2] Deshawn sometimes seems to be enveloped in a similar haze of loss.

Deshawn also carries the physical wounds of his upbringing. He was hit by a car when he was a teenager, while riding his bike. He remembers waking up after the accident and not being able to move. He continues to suffer pain in his right leg, for which he self-medicated with marijuana for years, until the institution of this case. Earlier this year, he was shot in the shoulder. *See* PSR ¶¶ 107, 109. The relentlessness of this adversity underscores the painstaking nature of the gains Deshawn has made in RISE and the importance of nurturing those gains.

---

[2] https://www.npr.org/2013/09/15/222105712/new-memoir-recounts-black-lives-reaped-too-young

### B.  The offense conduct

Deshawn grew up in the Heath Street housing development. His neighborhood crew of friends, classified in this case as a "RICO enterprise," was primarily a locus of *social* connection and stability for him, *not* a home for criminal wrongdoing or criminal tendencies. Remarkably, other than trespassing onto Heath Street grounds after he no longer lived there, Deshawn stayed completely out of trouble, from the age of 15 until the marijuana allegations at issue here. His lack of a criminal record makes clear that, although he was childhood friends with individuals from Heath Street, hung out with them, and listened to their music, he was not deeply involved in the business of the "gang."

Deshawn pleaded guilty to two predicate acts of marijuana distribution in connection with John Avalo, a Heath Street associate. *See* R11 Tr. at 18 (govt stating it would prove "defendant was involved in multiple acts of drug trafficking, each of which would constitute a predicate act. As noted before, there were multiple electronic communications seized from Joan Avalo-Quezada's phone . . . in which Avalo and the defendant discussed the defendant working for Avalo to distribute marijuana in the development in the period of approximately July 2021 to September 2021"); *id*. at 18-19 (govt: "[t]he pricing for the drugs is consistent with marijuana and not other drugs"); *id*. at 19 ("The marijuana trafficking was taking place at this Heath Street Housing Development"); *id*. at 20 ("[t]he defendant showed officers the contents of a plastic bag he had in his hands that included several small bags of a green leafy substance believed to be marijuana and a digital scale. The defendant said, 'Just weed and a scale, see?'"); *id*. ("Officers then approached the individual they had seen engaged in the apparent hand-to-hand with the defendant and asked what he had just purchased. That individual produced a small bag of green leafy substance of suspected marijuana from his sock"); *id*. at 22 (defense counsel: "He's pleading essentially or admitting two predicates involving marijuana trafficking"); *id*. at 23 (defense counsel: "he

5

understands that he has an association with members of the Heath Street . . . enterprise and that he participated in at least two acts, to wit, marijuana trafficking"); *id*. at 24 (Court: "So any conversation about a shooting aside, before I started asking [the prosecutor] questions, she gave what she thought was the factual basis that focused on marijuana trafficking, drug trafficking"). The defense rejects the allegation that he was involved in the May 11 shooting, as discussed below.

The defense also objects to so much of ¶ 71 as asserts that Deshawn distributed *cocaine*. The government has never charged that he was involved in cocaine distribution, did not mention it at the Rule 11 hearing, and the PSR is devoid of a sufficient basis for the assertion. *See* PSR at p.42 (asserting, "the Heath Street Gang is documented as engaging in the distribution of cocaine base, fentanyl, and marijuana" and, in one instance, "five minutes after a suspected drug deal occurs, the individual who was seen with the defendant is in possession of cocaine base," apparently referring to ¶ 35). As stated in Deshawn's objection, ¶ 35 does not document a drug transaction at all, prove that Deshawn supplied the cocaine, or prove that the individual identified as a "purchaser" (without describing any "purchase") was not *also* carrying marijuana.

## II.     THE REQUESTED SENTENCE IS CONSISTENT WITH THE GUIDELINES; ALL ENHANCEMENTS RELATED TO THE MAY 11 SHOOTING SHOULD BE DENIED BECAUSE MR. CIRINO WAS NOT INVOLVED.

### A. Relevant law

The Court is required to compute the Guidelines Sentencing Range ("GSR") as a "starting point and the initial benchmark," although it "may not presume that the Guidelines range is reasonable" and must "make an individualized assessment based on the facts presented," *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *Nelson v. United States,* 555 U.S. 350, 352 (2009)*,* including whether the advisory guidelines would result in a sentence that is unreasonably high. *See United States v. Kimbrough*, 552 U.S. 85, 109 (2007); *United States v. Boardman*, 528 F.3d 86 (1st Cir. 2008); *United States v. Martin*, 520 F.3d 87, 93-94 (1st Cir. 1998). This requires a "holistic

inquiry," in which "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Yonathan Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008). That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. The district court must "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id*. (emphasis added).

### B.  The GSR is 15-21 months.

As set forth in Deshawn's PSR objections, the base offense level ("BOL") for the marijuana distribution is 19. *See* U.S.S.G. § 2E1.1(a)(1). Notably, this BOL is already inflated due to the RICO conviction. As a point of comparison, absent the "enterprise," the BOL for distributing *up to a kilogram* of marijuana would be 6, *see* § 2D1.1(C). Here, Deshawn was engaging in hand-to-hand marijuana sales of small quantities.

In addition, Deshawn qualifies for the "zero-point offender" reduction. *See* U.S.S.G. §4C1.1. He has no criminal history, did not use violence, did not possess a firearm, and his offense did not result in serious bodily injury. *See id.* After acceptance of responsibility and § 4C1.1, the total offense level ("TOL") is 14 and the GSR is 15-21 months. *Cf*. PSR at p.41 (agreeing that, "[s]hould the Court . . . find the defendant is not accountable for the attempted murder," the TOL would be 14, after acceptance and § 4C1.1). The GSR supports the requested time-served sentence.

### C.  Deshawn was not involved in the May 11 shooting and the enhancement for "attempted murder" should be denied.

The government and Probation contend Deshawn should be held criminally responsible for a May 11, 2022 shooting committed by three individuals using his scooter. Yet the government's own agent *conceded* there is no evidence Deshawn knew what the individuals were going to do with the scooter. *See* Det. Hrg Tr. at 32 (**Q. Has the investigation developed any specific evidence to suggest [DeShawn] was made aware of what the three individuals on the scooter**

7

**planned to do? A. Not to my knowledge**.). The government cannot prove Deshawn knew they were going to commit a shooting,  let alone that he intended to facilitate it (let alone, as discussed in § II.D, below, that the shooting itself comprised an attempted premeditated murder). Imposing liability under these circumstances, in this posture, would raise serious constitutional concerns. *See United States v. Lombard*, 72 F.3d 170, 177 (1st Cir. 1995) ("consideration of the murders at Lombard's sentencing upstaged his conviction for firearms possession. The circumstances of this case that have combined to produce this effect raise grave constitutional concerns"); *see also United States v. Nguyen*, 255 F.3d 1335, 1341 (11th Cir. 2001) (holding RICO predicates used to calculate the base offense level must be proven beyond a reasonable doubt); *but see United States v. Carrozza*, 4 F.3d 70, 80-81 (1st Cir. 1993) (finding RICO predicates must only be proven by a preponderance of the evidence).

The evidence of participation by Deshawn is insufficient. The government alleges that surveillance footage from May 11, 2022, *see* Govt Det. Ex. 2, shows Deshawn congregating with Heath Street associates at 267 Centre Street (a housing complex), before the shooting, and "appear[ing] to hand [the] scooter keys to Torres." PSR ¶ 41. It argues the footage shows Deshawn talking with the three individuals and "sending" them out on the scooter. *See id*. ¶¶ 42-44.[3] But these actions—holding the bag, "setting up" or "sending off" the youngsters on the scooter—are as consistent with letting them take the scooter for a ride, or sending them to MacDonalds, as they are with anything nefarious. This innocuous conduct does not prove Deshawn had knowledge of what they were planning to do (let alone that he *intended* to facilitate it). *See* Det. Hrg. Tr. at 32.

The three individuals then drive off. According to the PSR, they shoot someone at 7:50 pm. PSR ¶ 46. The last time Deshawn appears in any of the footage is at 7:55pm, when he is

---

[3] The PSR additionally asserts Deshawn was holding someone's "backpack" ¶ 42. To be clear, based on Govt. Det. Ex. 2 slide 7, Deshawn appears to be holding a bag and then he either continues to hold it or puts it down on the ground (his right arm is not visible). But when the scooter leaves, no one is carrying a backpack.

outside 267 Centre Street and walks "towards the rear of the building." *Id*. ¶ 48; Govt. Det. Ex. 2 slide 11 at 7:55 pm. Notably, in Slide 11, he leaves is the *opposite* direction from where the scooter and the two kids reappear several minutes later, at 7:58 pm. *See* Slides 12, 13.

The PSR affirms this timeline: At 7:55pm, Deshawn walks toward the rear of the building. ¶ 46. "*About three minutes later,*" (at 7:57 or 7:58 pm,) Torres returns with the scooter. *Id*. ¶ 48. *Deshawn is not there. See id..;* Slides 12 & 13. When the scooter returns, only "Roberson, Cerone Davis, and Randy Pizarro are seen waiting outside 267 Centre Street." PSR ¶ 48. Slide 13 confirms that *Deshawn is not there*. At 7:58 pm, when "Torres, Hamilton and Pires arrive back at 207 Centre Street on the scooter, and Hamilton and Pires reenter the building," Deshawn is not there. *See* PSR ¶ 49; Slide 13. He is not present at 8:06 pm, when Hamilton and Pires reemerge from the building wearing different clothing. *Id*.  ¶ 50. And he is not there when Pires is arrested. *Id*. ¶ 51.[4] Deshawn Cirino is not seen or involved after 7:55pm. *See* Slide 11; PSR ¶¶ 48-52.

The agent's admission that the government has "no specific evidence" that Deshawn was made aware of what the individuals were going to do with the scooter should be dispositive. Det. Hrg. Tr. at 32. There are no texts, phone calls, recordings, statements, or any other evidence to substantiate the government's claim that by loaning the scooter, he became liable as an aider and abettor to the crime. *See United States v. Perez-Melendez*, 599 F.3d 31, 38 (1st Cir. 2010) (an aider and abettor must have "consciously shared the [principal's] knowledge of the underlying criminal act and intended to help him"); *United States v. Geronimo*, 330 F.3d 67, 74 (1st Cir. 2003) (discussing aiding and abetting liability, which requires: (1) knowledge the offense was being committed; (2) purposefully acting to advance the commission of the offense, and (3) possessing the mental state required for the offense). A "general suspicion that an unlawful act may occur

---

[4] Probation's assertion that Mr. Cirino "is still noted as being at the 267 Centre Street location" when the three individuals return, "eight minutes" after the shooting, PSR at p.40, has no factual basis. Mr. Cirino is last seen at 7:55 pm, ¶ 48, Slide 11, before the scooter returns.

or that something criminal is happening is not enough." *Geronimo*, 330 F.3d at 71. "Mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient." *Id*.

Nor is Deshawn jointly liable under the Guidelines. *See* U.S.S.G. §1B1.3(a)(1)(B); *United States v. Carrozza,* 4 F.3d 70, 75 (1st Cir. 1993) ("the base offense level for § 2E1.1 [is] determined on the basis of relevant conduct as that term is described in §1B1.3(a)(1)"). Relevant conduct under the Guidelines is limited to conduct that was *within the scope of the defendant's agreement*: "the accountability of the defendant for the acts of others is limited by the scope of his or her agreement. *Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct* under subsection (a)(1)(B). " U.S.S.G. § 1B1.3 Cmt. n.3 (emphasis added). The shooting was not within the scope of Deshawn's agreement to distribute marijuana.

In sum, Deshawn was not a participant in the May 11 shooting, it is not relevant conduct, and the Court should deny all of the enhancements and skip to § II.G, below.

**D. There is insufficient evidence that the May 11 shooters themselves committed an "attempted murder," rather than an aggravated assault.**

Separately and independently, the government fails to prove that the three individuals themselves committed an "attempted murder." *See* PSR ¶ 64 (using BOL 33); U.S.S.G. §2A2.1(a)(1) (BOL 33 if the "object of the offense would have constituted first degree murder").

Attempted murder, under both Massachusetts and federal law, requires the specific intent to kill and malice aforethought. *See Commonwealth v. Johnston,* 446 Mass. 555, 559-62 (2006) (assault with intent to murder, M.G.L. c. 265 §15, or armed assault with intent to murder, M.G.L. c. 265 §18(b), require proof "that the perpetrator *possessed a specific intent to kill*" or that the perpetrator, while armed with a dangerous weapon, "*possessed a specific intent to cause the death of the person assaulted*" (emphases added); *Commonwealth v. Vick,* 454 Mass. 418, 428 (2009); *Commonwealth v. Hart,* 497 Mass. 1, 2& n.2 (2025); *Commonwealth v. Nardone*, 406 Mass. 123,

130 (1989) (discussing "malice" as "the element differentiating assault with intent to murder, G. L. c. 265, § 15, and assault with intent to kill, G. L. c. 265, § 29," a lesser included offense); *Commonwealth v. Murray*, 51 Mass. App. Ct. 57, 61 (2001) (elements of "attempted murder[] consist of the specific intent to kill[,] . . . malice," and an overt act); *Commonwealth v. Henson*, 394 Mass. 584, 591 (1985) (assault with intent to murder requires proof of both "malice, which in this instance means only absence of justification, excuse, and mitigation, and the specific intent to kill") (citation omitted); 18 U.S.C. § 1111 ("murder," under federal law, is "the unlawful killing of a human being with malice aforethought"). "Malice," under Massachusetts law, means that the defendant "intended to kill the victims and . . . such an intent to kill was unlawful, unexcused, without justification and without any mitigation." *Murray*, 51 Mass. App. Ct. at 63 n.11.

Attempt, under both Massachusetts and federal law, requires the same specific intent as the underling offense. *See Commonwealth v. LaBrie,* 473 Mass. 754, 764 (2016) ("The elements of attempt, whether general attempt or attempted murder, are (1) the specific intent to commit the substantive crime at issue, and (2) an overt act toward completion of the substantive crime"); *United States v. Bristol-Martir,* 570 F.3d 29, 39 (1st Cir. 2009) (same). Aider and abettor liability requires the same: a specific intent to kill with malice aforethought. *See Geronimo*, 330 F.3d at 74.

The evidence is insufficient to prove that anyone any of the three individuals specifically intended to kill, with malice aforethought. They drove the scooter to Mission Hill, where one of them shot a bystander in the calf and ran away. There is no evidence more than one shot was fired, the shot was fired from close range, or that there was malice, *ie.,* a lack of mitigation. There is no evidence about how or why the shooting erupted, whether the three individuals were the instigators, who they shot at, or why. They could have been ambushed, fired the gun by mistake, or fired to maim or scare someone, rather than to kill.

At most, the shooting was an aggravated assault, not an attempted murder. *See* U.S.S.G. §2A2.2 (aggravated assault encompasses firearm discharges); *United States v. Page,* 84 F.3d 38, 40-41 (1st Cir. 1996) (aggravated assault guideline applied where the defendant participated in a high-speed car chase, during which he "fir[ed] multiple gunshots at [the victims'] occupied and moving vehicle," striking one of them in the arm); *see also United States v. Roberts,* 162 F.3d 1170 (9th Cir. 1998) (finding defendant who went on a "violent rampage" and "threatened to kill [the victim] while attacking him" "intended to commit the felony of manslaughter" and therefore the aggravated assault guideline applied).

The government argues that the circumstances of the shooting itself establish the specific intent to kill and malice aforethought. This is overreach. Nothing about the shooting shows that even the three individuals who were there intended to kill someone, rather than to scare or wound someone, or that they were not acting with a *mens rea* of recklessness. There is no evidence of multiple gunshots, shots fired at close range, a wound that itself reflects an intent to strike the vital organs, or any other indicia of an intent to commit murder with malice aforethought. *See, e.g. Commonwealth v. Reaves,* 434 Mass. 383, 389-390 (2001) (sufficient evidence of intent to kill where at least two shots were fired, at close range, at the precise group with whom the defendant had a confrontation earlier that day, resulting in one victim being shot in the leg and another in the chest); *Commonwealth v. Jenks*, 426 Mass. 582, 585 (1998) (sufficient evidence of intent to kill where "two [] shots were fired at shoulder level" and there was testimony the shooter "paused to search out and aim at a particular individual"); *Commonwealth v. Sylvester*, 35 Mass. App. Ct. 906, 906 (1993) (jury could infer intent to kill from a "close range" "fusillade of shots, some fired after the victim had already been hit in the knee and was sprawled on the ground"); *United States v. Turnipseed,* 47 F.4th 608, 614-15 (7th Cir. 2022) (upholding use of "murder" guideline, where defendant "took out a handgun and began firing at the rival gang member" and victim "was shot

four times," including "near her lower chest"). Here, by contrast, one shot was fired, from an unknown distance, under unknown circumstances, and it struck a bystander in the calf. The shooter then ran away, without making further attempt.

The government argues this case is analogous to *United States v. Teixeira,* 1:20-cr-10197-LTS, where Judge Sorokin found the facts supported an "attempted murder" enhancement. *See* Govt. Resp. to PSR Obj. at 2. The analogy fails. In *Teixeira*, the defendant was not only present during the shooting but *fired five to six shots himself. See id.* D.E. 618 at 11 (Dec. 5, 2022) ("They get out of the car, there's a shootout. And Mr. Teixeira fires five to six shots. . . . He tried to kill someone"); *id*. at 34 (court stating, at sentencing, "one night, you went into another neighborhood, the neighborhood of the other group, [] you got out of the car in front of a group of people, you had a gun, you pulled out a gun, and with the intent to kill somebody, you went bang, bang, bang, and shot"). Both the circumstances of the shooting in *Teixeira,* and the defendant's role in it, make that case distinguishable. As to the former, the shooter fired 5-6 shots – indicia of an intent to kill with malice aforethought. No such indicia are present here. And as to the latter, Teixeira *was an actual shooter in that crime*, whereas Mr. Cirino was not even there.

This Court found co-defendant Keyon Roberson responsible for a "conspiracy to commit murder" on December 7, 2019. *See* D.E. 412 at 10-13 (Sept. 25, 2025 Sent. Tr.). But that circumstance is also distinguishable. Roberson was a direct participant in the conduct at issue: he was in the back seat of the car, with the firearms, on the anniversary of the killing of an associate. *See* D.E. 412 at 8. He stated, in recorded phone calls after the fact, that "he's a murderer and should be shown the respect from the gang for that even though he failed." *Id*. at 13; *see also id.* at 11 (similar); *id.* at 9 ("what he's referring to [in phone calls] is that he's a murderer"); *id*. at 13-14

13

(conversation concerning "whacking people" and "upping the score").[5] The Court found, based on the date of the activity, Roberson's presence in the car with the firearms, and the recorded calls, that the circumstances supported an inference that *someone* in the group possessed an intent to commit murder and that supported joint liability. *See* Roberson Tr. at 15 (Court: "under the conspiracy theory, if he gets into the car with the other two, knowing their intent is to kill, even if his intent is to shoot wide or whatever it is, he can still be liable for the attempted murder, right?"[6]). The present situation lacks equivalent circumstances indicating that *someone* intended to kill; Mr. Cirino did not participate in the shooting; and there is no conceivable basis for joint liability here. Unlike Roberson, the scope of Mr. Cirino's agreement to distribute marijuana did not even arguably encompass murder, firearms, or any violence.[7]

The government also cites McDonald-Jones, whom this Court held responsible for an August, 2020 conspiracy to commit murder. D.E. 594 at 8 n.11. But McDonald-Jones was *at the shooting, with the guns*. *See* D.E. 486 (Sent. Tr.) at 16 (Court: "He goes into rival gang territory at 3:00 in the morning with a gun"); *id*. at 30 (Court: "I'm finding that he was in a car with those

---

[5] Notably, the government at Roberson's sentencing did not press the instant, May, 2022 shooting as an attempted murder. *See* D.E. 412 at 7 ("Mr. Crowley is not pressing the May of 2022 event as an attempted murder").

[6] The defense does not necessarily agree with that statement, but for present purposes the point of distinction is that, unlike Mr. Roberson, Mr. Cirino was *not* present and did *not* know what the other individuals were going to do. There is no evidence his agreement to distribute marijuana encompassed a shooting.

[7] The scope of Roberson's participation in the Heath Street gang encompassed two shootings, an armed robbery, drug trafficking, and credit card and pandemic assistance fraud. *See* D.E. 365 at 5; D.E. 64-1 (Det. Aff.) at 10-11 (phone calls concerning violence), 19 (Dec. 7, 2019 events), 22 (Jan. 6, 2021 shooting), 24 (Nov. 7, 2021 armed robbery). Mr. Roberson was a more serious participant in the Heath Street enterprise, under any number of metrics. He was detained pre-trial, *see id*. at 24, unlike Mr. Cirino. Roberson's plea agreement contemplated a sentence of between 60-108 months. *See* D.E. 316. And he had some criminal history. *See* D.E. 365 at 7 (CHC II). Yet, ironically, the government argued for a GSR of 108-135 months there and asserts the GSR here is 151-188-months. *See* D.E. 412 at 7. It is wrong.

14

people who went there to commit a shooting"). There were also calls in which McDonald-Jones discussed "these types of attacks," *id*. at 11. He had a violent history with the gang, including at least one prior shooting. *See id*. at 12, 32; D.E. 454 at 4-5. And the murder was charged as a *conspiracy*, *see* D.E. 454 at 6-7. Given McDonald-Jones' history of violent acts with the gang, that shooting was within the scope of his agreement, unlike here.

At most, the government establishes that three individuals committed an aggravated assault on My 11. Because aggravated assault is not a RICO predicate, the BOL for Mr. Cirino is 19. *See* PSR p. 41 ("Should the Court agree with the defendant and find the defendant is not accountable for [] attempted murder, . . . the generic base offense level of 19 [applies]").

### E.  The enhancement for "serious bodily injury" should be denied.

The Court should deny the further enhancement, within the "murder" Guideline, for "serious bodily injury" ("SBI"). *See* PSR ¶ 65.

First and foremost, Deshawn is not responsible for the shooting *or* the injury.

Separately and independently, the government has not adduced facts satisfying the criteria for SBI. The Guidelines define "bodily injury" simpliciter as "*any significant injury*; *e.g*., an injury that is painful and obvious or is of *a type for which medical attention ordinarily would be sought*." U.S.S.G. § 1B1.1, App. n.1(b) (emphasis added). That is exactly what occurred here: the bystander was shot in the calf – a "significant injury," for which "medical attention" was sought. By contrast, SBI requires proof of an "injury involving extreme physical pain or the *protracted impairment of a function* of a bodily member, organ, or mental faculty; or requiring *medical intervention such as surgery, hospitalization, or physical rehabilitation*." *Id*. App. n.1(L) (emphasis added).

The government produced no evidence to satisfy these requirements. The victim was "shot in the calf" and taken to the hospital. PSR ¶¶ 65, 46;  Govt. Resp. to PSR Obj. The government has provided no medical records and no statements by the victim. Accordingly, there is no evidence

15

the victim was hospitalized, received "medical intervention," "surgery," or "rehabilitation," or that he experienced a loss of function, missed work, or experienced protracted pain. A gunshot wound is not, in and of itself, a "serious bodily injury." *See United States v. Moore*, 997 F.2d 30, 37 (5th Cir. 1993) (stating the "lower departure [for simple body injury] may arguably have been more appropriate," where the victim suffered a gunshot through his leg, reported "the wound was extremely painful and that his leg still aches on occasion," and he was "out of work for two weeks and on light duty for two to three months as a result of the injury"). Absent at least the quantum of evidence in *Moore*, only basic "bodily injury" is established.

### F. The enhancement for "use of a minor" should be denied.

Because Deshawn did not commit the shooting, he did not "use" a minor to commit it. *See* § 3B1.4; *United States v. Salvador-Gutierrez*, 128 F.4th 299, 302, 321 (1st Cir. 2025).

### G. U.S.S.G. § 5H1.1 supports a downward departure for youthfulness and adversity.

U.S.S.G. § 5H1.1 was recently amended to respond to modern neuroscience about the developing brain. The adolescent and young adult brain is neurologically wired to be impulsive, inclined toward risk-taking, heavily influenced by peer connections, and less able to accurately appraise risk and understand consequences. *See generally*, Center for Law Brain and Behavior, *White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys, and Policy Makers* (2022).[8] Given this, the Commission's Policy Statement provides that:

> A downward departure [] may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain *risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships*. In addition, youthful individuals generally are more impulsive, risk-seeking, and

---

[8] Available at: file:///C:/Users/AmyBarsky.LAP-BPYYL63/OneDrive%20-%20Fick%20&%20Marx%20LLP/Desktop/Contents%20of%20Flashdrive%20E%202019.08.29/Juvenile/CLBB-White-Paper-on-the-Science-of-Late-Adolescence-3.pdf (last accessed Jan. 12, 2026).

susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation. . . . Accordingly, in an appropriate case, the court may consider *whether a form of punishment other than imprisonment might be sufficient* to meet the purposes of sentencing.

§ 5H1.1 (emphasis added); *see also* Amendment 829 (adding this language to "reflect[] the evolving science and data surrounding youthful individuals, including . . . that cognitive changes lasting into the mid-20s affect individual behavior and culpability . . . [and] that certain risk factors may contribute to youthful involvement in criminal justice systems, while protective factors, including appropriate interventions, may promote desistance from crime"); *Gall*, 552 U.S. at 58 ("'Immaturity at the time of the offense conduct is not an inconsequential consideration . . . [B]rain development may not become complete until the age of twenty-five'").

> The brain science underscores the late development of cognition in the social setting:

> Whereas adolescents might have the baseline capability of achieving a certain level of performance, they might not express that capability equivalently across situations. Behavioral research has indicated that adolescent regulatory behavior is challenged more than adults in contexts involving emotion, social evaluation, and reward. The contextual dependency of adolescent behavior implies that there is not one threshold of maturity—rather, there are waves of maturity that shape how influential different contexts are on behavioral performance

Somerville L, Searching for Signatures of Brain Maturity: What Are We Searching For? *Neuron*, 92, 1164-1167.[9]

Mr. Cirino was 23 years old during the 2021 marijuana trafficking discussed by the government at the Rule 11 hearing and 25 years old during the 2023 incidents of marijuana distribution. *See* PSR ¶¶ 35-38. He was emotionally and neurologically immature, in exactly the ways discussed by the Commission: "impulsive," "risk-seeking," and "susceptible to outside influences [his peers]." § 5H1.1. He was also deeply impacted by the adversity of his childhood.

---

[9] https://www.cell.com/action/showPdf?pii=S0896-6273%2816%2930809-1

Mr. Cirino's youthfulness, developing brain, and trauma history mitigate his culpability and support the requested non-custodial sentence. *See* § 5H1.1.

### III.   THE § 3553(a) FACTORS SUPPORT THE REQUESTED SENTENCE.

Given Mr. Cirino's successful RISE participation, youthfulness, adversity, lack of criminal history, lengthy time on pre-trial supervision, and the positive trajectory he has worked so hard to establish, any additional incarceration would serve no legitimate purpose—and would jeopardize his progress.

Through RISE, Mr. Cirino "made notable change [in his life,] including long-term sobriety and achieving vocational advancement for the first time in his adult life." RISE rept. at 1. For 30 months on pre-trial supervision, he has not committed any crimes, has not associated with Heath Street, has not been to Heath Street, has attended therapy, attended job training, availed himself of numerous volunteer opportunities, and applied for dozens of jobs. He completed an Industry Internship Program, a Work Ready Program, and secured his OSHA 10 Safety Certification. *See id*. at 2. Throughout, he has been a joint caretaker for his older brother Nathan, sharing responsibilities with his mother, and often staying up all night to monitor Nathan, who cannot be left unattended due to the risk of seizures, self-harm, or that he will try to leave the house unattended. *See* Ex.A at 1 (ltr. from mother). Mr. Cirino's mother notes that Deshawn bathes his brother, makes sure he eats, and allows his mother to "get some sleep." *Id*. She also notes that Nathan does not do well with change and to lose Deshawn would hurt both Nathan and her. Mr. Cirino also takes care of his younger brother, Jacob, because most of their mother's energy is engaged with Nathan and Ms. Rosado cannot leave the house because she cannot leave Nathan alone. Mr. Cirino additionally volunteers for approximately 25 hours per week as a PCA for a disabled woman named Michelle Vargas, because her son is incarcerated. Mr. Cirino helps clean her house, prepare food, dresses her, sets up appointments for her, and assists her with the activities

18

of daily living ("ADLs"). *See* id. at 2 (Vargas ltr.). He is "helpful and caring," and she does not have anyone else. *Id*.

Mr. Cirino has been attending therapy and working to address his mental and behavioral health challenges. *See id*. at 3 (therapist ltr.); RISE rept. at 1-2. He has been volunteering at a local martial arts program for kids, mentoring them and helping to chaperone activities. *See* Ex. A at 4 (ltr. from Save Another Youth Taekwondo Inc.). He reports he enjoys being a positive role model for kids and "helping out." These are all prosocial activities he has undertaken to focus his life in a positive, engaged direction. He has stopped using marijuana, a huge feat, given his heavy usage prior to this case, to cope with both physical and psychological pain. As Judge Hedges noted, "although he [] faced setbacks throughout the program, including losses of people very close to him, he showed that he was able to use healthy coping strategies and stay focused on remaining sober and law abiding, and making strides on a new path." RISE rept. at 2. Mr. Cirino had an extremely positive experience in Restorative Justice program. *See id*. All of these steps reflect his conscious choice to move himself in a positive direction.

Mr. Cirino has been specifically deterred. No further prison sentence is necessary to achieve that goal. *See Gall*, 552 U.S. at 59 ("imprisonment [i]s not necessary to deter [him] from engaging in future criminal conduct or to protect the public from his future criminal acts"). To the contrary, any further prison sentence here would be *counter*-productive and would wipe out all of his hard-fought gains over the past 30 months.

Nor would a prison sentence serve the goal of *general* deterrence. Both gangs and drug trafficking are fundamentally *social* problems for which incarceration is not an effective "treatment."[10] The goal of general deterrence can be served here by showing, through Mr. Cirino's

---

[10] *See* https://homeboyindustries.org/our-story/father-greg/ ("gang violence is about a lethal absence of hope"); https://www.youtube.com/watch?v=ipR0kWt1Fkc&t=670s (Ted Talk by Greg Boyle); "'War on drugs has failed, completely and utterly': UN human rights chief,"

positive experience with RISE, that the federal courts are here to *help* people turn their lives around, through programs like RISE, not to simply reflexively punish them for their deficits. *See United States v. Green*, D. Mass. No. 19-10421-6, D.E. 643 (Apr. 24, 2023 Sent. Tr.) (Judge Woodlock explaining, in imposing time-served sentence for a RISE defendant, "general deterrence is a tougher matter . . . I want other people who are in similar situations to you to consider carefully how they can make their position better by participating in programs like RISE, if you're eligible for RISE and if you participate effectively. . . That's a form of general deterrence as well. You call it a second chance"); *Gall v. United States*, 552 U.S. at 54 ("'a sentence of imprisonment may work to promote not respect, but derision, . . . if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved"). In a poignant illustration of this, Mr. Cirino's grandmother remarked, after she attended his RISE graduation, that this was the first time she felt welcome at the Moakley courthouse.

Time-served is not a "light" punishment. Mr. Cirino was in custody for two weeks before his release. He has also spent the last 30 months on pre-trial supervision, with a substantial portion of that time under strict curfew. He will be on supervised release for several years to come. *See Gall*, 552 U.S. at 48 (discussing probation conditions as "substantially restrict[ing a person's] liberty"). And most troublingly, the conviction itself carries lifelong collateral consequences, as Mr. Cirino joins the millions of Americans branded as "felons." As a poor person and a person of color, these consequences are especially weighty: the loss of access to public benefits, housing, and job opportunities, as well as the loss of full civic participation in American society.

## CONCLUSION

For all of these reasons, time-served is the appropriate sentence, whatever the Guidelines.

---

*United Nations* (Dec. 5, 2024 ("Criminalisation and prohibition have failed to reduce drug use and failed to deter drug-related crime. These policies are simply not working – and we are failing some of the most vulnerable groups"), https://news.un.org/en/story/2024/12/1157836

Respectfully submitted,

**DESHAWN CIRINO**
by his attorneys

*/s/ Amy Barsky*
Amy Barsky (BBO #601111)
William Fick, (BBO #650562)
FICK & MARX LLP
24 Federal St. 4th Floor
Boston, MA 02110
857-321-8360
ABARSKY@FICKMARX.COM
WFICK@FICKMARX.COM

## Certificate of Service

I, Amy Barsky, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 23, 2026.

*/s/ Amy Barsky*