IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DESHAWN CIRINO | No.  1:23-cr-10186-ADB-6 |

**DEFENDANT DESHAWN CIRINO'S SUPPLEMENTAL SENTENCING
MEMORANDUM ADRESSING INTELLECTUAL DISABILITY
<u>AND ATTACHING ADDITIONAL LETTER EXHIBITS</u>**

After reviewing Deshawn Cirino's Special Education records,[1] the defense hereby provides this Supplemental Sentencing Memorandum to address Deshawn's intellectual disability ("ID") diagnosis and its implications for sentencing. He files the underlying records as Sealed Exhibit C.

The defense also attaches a short allocution letter as Exhibit A (Deshawn is concerned that he may be too nervous to speak at sentencing) and an additional just-received letter of support from Kelley Torres as Exhibit B.

As revealed in PSR ¶ 116, Deshawn was diagnosed with ID at the age of six. That diagnosis generally applies when an individual has an IQ below 70.[2] Deshawn had an IEP on that basis from kindergarten through his last schooling in ninth grade. *See* Sealed Ex. C. He received extra time to complete work, clarified directions, "extra time to process information," verbal prompts, "cueing back to task," and check-ins with the psychologist or counselor. *Id.* at 7, 18, 29, 41, 70, 87. He was

---

[1] Prior to reviewing (for the first time yesterday and today) records obtained by Probation, defense counsel had requested records and followed up with both the Boston Public Schools Helpline and BPS Special Education approximately half-dozen times between August, 2024, and March, 2025, but never received records.

[2] *See* https://minnstate.pressbooks.pub/introductiontospecialeducation/chapter/intellectual-disability-id-or-development-cognitive-delay-dcd-dd-7/ ; *see also* https://www.projectidealonline.org/v/intellectual-disabilities/

placed in a special education classroom, based on a finding that "the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id*. at 11, 22, 33, 46 (required "nonparticipation justification" in each IEP, quoting IDEA and related regulations). Notwithstanding these services, he was held back twice before eventually dropping out of school after the ninth grade. *See* ¶ 116; Sealed Ex. C at 85.

Deshawn was often absent from school. *See, e.g.,* Sealed Ex. C at 1-2 (school staff note on 11/19/14, "I've left three messages for three family members that Deshawn is not showing up to school and needs to," and on 12/9/14, "Continue to try and reach someone at home but am unable to"). His family did not have the resources to supervise his attendance, to push for better services, or to encourage him to persevere. *See, e.g., id*. at 6, 17, 52, 69, 85 ("neither Deshawn nor his parent attended" ninth grade IEP meeting), ("parent did not attend" eighth grade IEP meeting), (parent did not attend third grade or two second-grade IEP meetings). To this day, Deshawn struggles to express himself with words. His IEPs often included "extra time to process information, verbal prompts, . . . [and] check ins with psychologist, counselor." *Id*. at 7, 18, 29. This lack of language with which to express feelings often leads to depression in young people with ID. *See* American Academy of Child and Adolescent Psychiatry, "Intellectual Disabilities" (Oct. 2023).[3]

The ID diagnosis mitigates Deshawn's culpability, as a general matter. *See Atkins v. Virginia,* 536 U.S. 304, 318 (2002) (people with ID "by definition [] have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. . . . Their deficiencies do not warrant an exemption from criminal sanctions, but they do

---

[3] https://www.aacap.org/AACAP/Families_and_Youth/Facts_for_Families/FFF-Guide/Children-with-an-Intellectual-Disability-023.aspx

diminish their personal culpability"). More specifically, the defense suggests four ways in which the Court should consider Deshawn's ID.

First, it gives context to Deshawn's challenges—and accomplishments—in RISE. He made important, incremental progress, even as he put in monumental effort that still often appeared to come up short of an optimal or fully successful outcome. He sometimes did not arrive places on time, did not follow up or follow through, and seemed not to understand people's reactions to that or the longer-term consequences. He had a very difficult time planning and executing. He did not want to engage in Hi-set or GED services, which now seems more understandable, given how he struggled in school and even with his struggles, made little progress. *See* Sealed Ex. C at 3-5 (9th grade Progress Report three teachers noting no progress, e.g., "Deshawn has not made progress towards his reading and writing goals term 3. Deshawn was absent over 40 days"). Notwithstanding these limitations, Mr. Cirino worked extremely hard in RISE and made real, appreciable, positive gains: "while he did not achieve all of his RISE goals, given the challenges that he entered with, he made notable change including long-term sobriety and achieving vocational advancement for the first time in his adult life." These gains are all the more laudable, meaningful, and hard-fought, given his challenges.

Deshawn attaches a sentencing allocution letter to the Court as Exhibit A.[4] Notably, it talks about the significance of his experience in RISE. He is conscious of how helpful it was and how good it felt to have people "push" him to do better. He did not receive that kind of engagement and "push" as a child. He floated and floundered. RISE gave him a newfound sense of accountability, satisfaction, and possibility that can only portend good things—and could easily be crushed by a prison sentence. He notes excitement at the prospect of having his own apartment, for example. *Id.*

---

[4] Counsel has added punctuation to the letter but otherwise edited the letter only minimally.

Second, Deshawn masks his cognitive limitations by being affable, generous, and "going with the flow." Even in counsel's relationship with him, there have been times when he outwardly appears to understand, engage, and be "on board," but then it is as if the conversation never happened. This is an adaptation by someone who fundamentally experiences a different level of understanding—and therefore the ability to participate and engage—than those around him. He has learned to "get by," without ruffling feathers and without asking questions. *See, e.g.,* Sealed Ex. C at 17 (eighth grade IEP stating, "Desahwn is well liked by adults at school. Deshawn wants to do well in school. . . .  He struggles to infer meaning from a text. . . . He is [] reluctant to show w[h]en he does not understand. He is disorganized. His desk is full of papers and he does not use a backpack").

Third, Deshawn's genuine cognitive limitations corroborate his innocence of the scooter incident.[5] Even assuming, for the sake of argument, that someone of average intellect might have known or intuited some kind of foul play was contemplated with the scooter, Deshawn did not. Maybe others purposely left him out of discussions. Maybe he is gullible, or not inclined to ask questions. His intellectual limitations make it even more likely that he did not understand what the kids wanted to do with the scooter—other than simply take a ride—did not ask questions, and/or did not think about what might unfold.. *Cf. Atkins*, 536 U.S. at 318 ("there is abundant evidence that [people with ID] . . . in group settings they are followers rather than leaders").

Fourth, the ID has implications for what a prison sentence would be like for Deshawn. Individuals with disabilities experience disproportionate levels of violence by both prisoners and guards; there is less appropriate programming available; they are more likely to receive disciplinary infractions for behavior that is viewed as "obstinate," rather than rooted in a cognitive

---

[5] Of course, it remains the government's burden to prove that Mr. Cirino is responsible for the shooting, which it cannot meet for reasons discussed in his principal sentencing memorandum.

deficit. *See* Center for American Progress, *Disabled Behind Bars* at 10-13 ("Prison and jail inmates with disabilities are also at special risk for mistreatment by guards and other correctional employees, and abuse at the hands of their fellow inmates").[6] "Intellectual disability itself is a risk factor for victimization." Stancliffe, R, "Criminal Justice and People with Intellectual and Developmental Disabilities," *Intellect Dev Disabil*. 2024 Jun 1;62(3):211-224[7]; *see also* Sarett, J., *The Conversation* (May 7, 2021) ("Prisoners with [ID] are at greater risk of serving longer, harder sentences and being exploited and abused by prison staff or other incarcerated people")[8]; *The Conversation* ("Confusion in prison and jail can lead to violence or danger. Needing time to process instructions, particularly in high-stress situations, can be interpreted as obstinacy by staff and officers in charge," and "can lead to disciplinary reports in prison or jail, which could result in added time to someone's sentence or the removal of certain privileges"). And a prison sentence would lay waste to Deshawn's hard-fought gains and confidence earned through RISE, gains that would be very difficult for him ever to recoup.

In sum, the defense asks the Court to consider Deshawn's ID in evaluating his offense conduct, his performance on pre-trial release, his culpability, and the impact of a potential prison sentence.

Separately, the defense also attaches an additional sentencing letter from Kelley Torres, who speaks to Mr. Cirino's generosity in caring for others, including when she faced a violent attack, and the valuable role he plays as a caretaker in the community. *See* Ex. B.

---

[6] https://www.americanprogress.org/wp-content/uploads/sites/2/2016/07/2CriminalJusticeDisability-report.pdf

[7] https://pmc.ncbi.nlm.nih.gov/articles/PMC12360897/

[8] https://theconversation.com/us-prisons-hold-more-than-550-000-people-with-intellectual-disabilities-they-face-exploitation-harsh-treatment-158407

Respectfully submitted,

**DESHAWN CIRINO**
by his attorneys

*/s/ Amy Barsky*
Amy Barsky (BBO #601111)
William Fick, (BBO #650562)
FICK & MARX LLP
24 Federal St. 4th Floor
Boston, MA 02110
857-321-8360
ABARSKY@FICKMARX.COM
WFICK@FICKMARX.COM

## Certificate of Service

I, Amy Barsky, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 29, 2026.

*/s/ Amy Barsky*

6